IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DAVID W.,<br>　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>　　Defendant. | Case No. 4:17-cv-04336-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 9) and the Defendant's Motion for Summary Affirmance (Doc. 13). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.

**I**

David W. originally filed his application for Supplemental Security Income (SSI) on January 27, 2015. He alleged disability beginning on May 1, 2012, though he subsequently amended his onset date to August 29, 2015. His claim was denied initially on May 29, 2015 and was denied upon reconsideration on August 27, 2015. David filed a request for hearing concerning his application for SSI on September 16, 2015, and a hearing was held before the Honorable Diane S. Davis (ALJ) on February 7, 2017. At that hearing, David was represented by counsel and a vocational expert (VE) testified. Following the hearing, David's claim was denied

on April 3, 2017. His request for review by the Appeals Council was denied on November 3, 2017, making the ALJ's Decision the final decision of the Commissioner. David filed the instant civil action seeking review of the ALJ's Decision on December 29, 2017.

## II

David was 49 years old on the filing date and was 50 years old on the amended onset date. At the time he filed his SSI application, David lived in a home with his wife. He alleged his ability to work was limited by bipolar disorder, illiteracy, high blood pressure, anxiety, and the amputation of his left ring and middle fingers. AR 264, 294.

At the hearing, David first testified about his work as a janitor for five months in 2016. He vacuumed, bent over to pick things up, cleaned bathrooms, and mopped. He said that job ended because he had to take breaks every 20 minutes due to shortness of breath, and, consequently, his supervisor suspended him for two weeks. After that, David chose not to return. David also said that he had problems picking up and carrying things at that job because his hands were constantly numb, which was in addition to his shortness of breath. He stated, "I drop everything." AR 56. He anticipated a referral to a specialist to treat his hands.

David testified that he was left-hand dominant and following the amputation of the fingertips of his left middle and ring fingers in May 2015, he attended physical therapy for three months. He was released "[b]ecause they said they couldn't do too much more with it," and, according to David, he did not have any improvement in his functioning. AR 58. He explained further that he was shown how to work with two fingers instead of his whole left hand. He was, to a certain extent, able to use his left hand to run the vacuum, pick up the mop, and wipe things down when he worked as a janitor after the amputations.

David also testified that he took the commercial driver's license (CDL) test orally after his wife "drove" the CDL program and test into his head for six months before the test, and then he took the test orally with a headset. David had his CDL for two years and believed it would be suspended the next month following the hearing because he would not be able to pass the physical; he said his hands – arthritis – would prevent him from passing the physical. He spent two years doing "short runs" as a truck driver until he lost the contract under which he did those short runs. AR 61. David maintained his CDL because he anticipated that he could return to driving a truck. David had a regular driver's license and was able to drive regularly. He also had a license to drive a motorcycle and occasionally rode his brother's motorcycle. He was able to ride the motorcycle for only "about half an hour because of my hand." AR 63.

David testified that he received mental health treatment at the Robert Young Mental Health Center (Robert Young), and he saw his case manager weekly, his nurse weekly, and he attended three or four groups during the week including for anger management and depression. David attended the anger management group since May 2015 when he hurt his left hand.

Upon questioning by his attorney, David testified further regarding the circumstances surrounding his job as a janitor. He stated he was placed into full-time position, but when someone else was hired he was then placed back on part-time, whereupon proceeded to "[go] off on [his supervisor]" and after that was suspended for two weeks. AR 67. David clarified that he had problems with numbness in both of his hands. He also stated that he had problems with dexterity and grip with his left hand after the fingertip amputations. When he drove, David did not read road signs as his wife was constantly with him. "She did all the paperwork. She did the programing of the GPS. Basically, the only thing I did was – I was driving the truck." AR 69. David did not think he would have been

3

able to drive the way he did without his wife in the truck with him. David represented that he could read his name and small words like "to" and "the." AR 70. He said he cycled between manic and a more depressed state (due to his bipolar problem) "[a]t least once a day." *Id.* He had problems with attention and concentration during the daytime.

The VE was then questioned and first explained that David's past work as an over-the-road truck driver was semi-skilled, his past work as a janitor was semi-skilled, and his past work as a newspaper delivery driver was also semi-skilled. The ALJ then posed the following hypothetical individual:

> [A]n individual the claimant's age, education, and work history. Further assume such an individual can perform work at all exertional levels, but with the following non-exertional limitations. The individual can understand, remember, and carry out simple, routine tasks, make simple work-related decisions, and adapt to routine workplace changes. The individual can persist in such activities in two-hour intervals before requiring a break with adequate pace and perseverance.

AR 78. The VE testified that the individual could not perform any of David's past work. However, other work existed in significant numbers in the national economy, including dining room attendant, kitchen helper, and hospital food service worker. When the ALJ added to the hypothetical that the individual was limited to the light exertion level, the VE responded that the jobs of housekeeping cleaner, cafeteria attendant, and laundry worker could be performed by that individual. The ALJ then added to the hypothetical that the individual could not finger with the left dominant hand. The VE answered that all three cited jobs "would be lost." AR 79.

David's attorney then noted all of the jobs the VE identified were given Dictionary of Occupational Titles (DOT) numbers. He asked the VE:

> Q. It is – is it correct – if I were to say all jobs in the DOT have a level 1 for – under the RML, L for language for the reading requirement, all jobs identified by DOT number have a language requirement of at least a level 1, would that be an accurate statement?
> A. Yes, it would.
> Q. . . . Do you – are you familiar with the description of a level 1 language or reading ability? And if so, if you have that there, could you read it to us?
> A. . . . Now, level 1 – I can give you the specific stuff . . . for level 1 in the DOT, the grade equivalent to that is first through third grade.
>
> * * *
>
> A. Level 2 would be fourth through sixth grade.
> Q. . . . But no functional description as to the words per minute that needs to be read? Do you have any of that information there?
>
> * * *
>
> A. I'm pulling up housekeeping cleaner just for purposes of discussion.
>
> * * *
>
> A. And that – it does – the language development there – it's – it does happen to be level 1.
>
> * * *
>
> A. And the reading requirement is recognizing the meaning of 2,500 two- and three-syllable words, reading at a rate of 95 to 120 words per minute.

AR 80-81. The VE finally testified that her testimony was consistent with the information contained in the DOT and its companion publication, the *Selective Characteristics of Occupations*.

### III

In her Decision at Step Two, the ALJ determined David had the following severe impairments: a left anterior fascicular block (heart disease); amputation of the distal interphalangeal (DIP) joints of the left ring and long fingers; obesity; bipolar disorder; and anxiety. AR 31. The ALJ considered David's alleged dyslexia and difficulty reading and found those impairments considered together to be a "non-medically determinable" impairment where there was no objective

evidence to support David's statements. The ALJ explained that pursuant to 20 C.F.R. § 416.921, a physical or mental impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms." AR 32.

At Step Three, the ALJ determined David's mental impairments were not of a severity to meet or medically equal the relevant listing criteria. The ALJ found mild limitation in David's ability to understand, remember, or apply information:

> While the claimant contends that his functional abilities are severely limited, it is difficult to reconcile the fact that the claimant, throughout the period of alleged total disability, reported he continued to operate a motor vehicle and a motorcycle, and retained a driver's license, a motorcycle license, and a commercial driver's license[.]

AR 34. The ALJ continued:

> The operation of a vehicle is a very dynamic task in a changing environment that is largely influenced by the driver . . . Driving as an activity is therefore made up of strategic decisions . . . maneuvering decisions, . . . and control decisions . . . , all of which indicate functioning at a level in excess of that alleged by the claimant.

*Id*. The ALJ found mild limitation in David's ability to interact with others. The clinical evidence indicated that he interacted with family and friends and "even [drove] his wife around after they separated." *Id*. David had moderate limitation in concentration, persistence, or maintaining pace and in adapting and managing oneself.

> The ALJ made the following residual functional capacity (RFC) finding:
>
> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can understand, remember, and carry out simple, routine tasks, make simple work-related decisions, and adapt to routine workplace changes. He can persist in such activities in two-hour intervals, before requiring a break, with adequate pace and perseverance.

6

AR 36. In making that finding, the ALJ summarized David's hearing testimony as well as David's March 2015 Adult Function Report and his former spouse Sheri's March 2015 Third Party Function Report and her July 2015 statement. In March 2015, Sheri indicated David could attend to his own personal care, drove a car, could rake and mow occasionally, could pay attention for about an hour, and could follow written instructions "a little" though he was better with spoken instructions. AR 37. In his July 2015 Adult Function Report, David indicated he could pay attention for 30 minutes.

The ALJ reviewed David's reported activities of daily living during the period relevant to the Decision. The ALJ cited as unsupportive of David's alleged symptoms and limitations the fact that he had a valid driver's license, motorcycle license, and CDL. She also considered David's report that he initially stopped working for reasons other than his impairments; he stopped working in newspaper delivery as he was not making a profit, he previously stated he stopped working as a janitor because he quit due to the number of hours he was given, and he reported that he lost his job as an over-the-road truck driver in July 2014 when he lost his driving contracts. The ALJ commented:

> [T]he claimant's continuing job search has been documented in the evidence . . . also suggests [sic] the possibility that if an employer had had positions available, perhaps the claimant would not currently be claiming disability, and that the reason for the claimant's continued unemployment is not solely the alleged impairments.

AR 37-38. Following surgical completion amputations at the distal interphalangeal joint disarticulations of his left middle and ring fingers, David attended physical therapy. Upon discharge from therapy in June 2015, after having met all of his goals, the therapist noted David had a functional level of fine motor coordination in his left hand, and he subjectively reported, "It feels normal now." AR 38.

The ALJ noted David was assessed a range of global assessment of functioning (GAF) scores that ranged from 20 to 70. She gave them little weight. The ALJ pointed out that David was hospitalized in late June 2015 for reports of suicidal ideation and was discharged upon improvement of his symptoms. At that time, he reported he tolerated his medications with no apparent side effects. At a six-month review visit to Robert Young, David reported he wanted to return to full time driving, described himself as being a quick learner and very motivated, had the ability to follow instructions well, and felt his current treatment plan had worked. The ALJ summarized:

> [T]he objective evidence does not document ongoing issues in getting along with others, as a mental status exam again continued to show he was appropriately depressed [sic], had no psychomotor abnormalities, normal speech, a euthymic mood and appropriate affect, goal directed and linear thought processes, no cognitive deficits, above average intelligence, appropriate thought content, normal orientation, and fair insight and judgment with intact immediate, recent, and remote memory[.]

AR 40.

The ALJ next turned to the opinion evidence of record which included the State Agency medical consultants' and psychological consultants' opinions at the initial and reconsideration levels. With regard to the psychological consultants' opinions, the ALJ gave great weight to Lionel Hudspeth, Psy.D.'s opinion at the initial level and gave partial weight to Kirk Boyenga, Ph.D.'s opinion at the reconsideration level. Lastly, the ALJ listed the jobs cited by the VE at the hearing that a person of David's age, education, work experience, and RFC could perform: housekeeping cleaner; cafeteria attendant; and laundry worker.

IV

David argues: 1) the ALJ's finding that David has no manipulative limitations in his left hand is not supported by substantial evidence; 2) the ALJ's

finding that David has a limited education is not supported by substantial evidence; and 3) the ALJ's finding of mental residual functional capacity is not supported by substantial evidence.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 416.966. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 416.920. In the following order, the ALJ must evaluate whether the claimant:

1)   currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)   suffers from an impairment that is severe or whether a combination of his impairments is severe;

3)   suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)   is unable to perform his past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)   is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, David claims error on the ALJ's part at Step Four.

**A**

David first argues that the ALJ's finding of no limitations in the areas of fingering and fine manipulation is not supported by substantial evidence. He argues the ALJ presented no inconsistency between the evidence and his assertions that he has problems using his left hand. He contends remand is required given the determinative importance of the ability to use the hands in performing the jobs to which the VE testified. The Commissioner disputes that

David met his burden to show that he requires manipulative limitations. The Commissioner argues David's reliance upon his own subjective reports is unavailing, and he has otherwise waived any argument pertaining to the ALJ's subjective symptom analysis. David's argument is not so perfunctory in that regard for the Court to consider it waived.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), *citing* SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

The ALJ pointed out that the fact David was able to ride a motorcycle was inconsistent with his allegations that he dropped things and suggested his hands were "sufficiently reliable that he would trust them while riding." AR 37. Following surgical completion amputations of his left ring and long fingertips, David underwent physical therapy and was discharged after having met all of his goals. His physical therapist noted that David had a functional level of fine motor coordination in his left hand. The ALJ also pointed out that David continued with his job search even during the time he claimed he was disabled. The ALJ observed at the hearing that David was able to move his fingers appropriately and used them to grip an item in his hand. Record evidence provided that in June 2015, shortly after his left hand injury, he spent time working on cars which was "inconsistent with [David's] claim of limitations in

11

the use of his left hand." AR 38. The ALJ further noted that David was able to work as a janitor after his injury, and he testified he could do the job tasks with his left hand. Given all that, the ALJ found "the amputations are more than sufficiently accounted for in the residual functional capacity assessed [in this Decision]." *Id.*

Substantial evidence supports the ALJ's finding of no limitations in the areas of fingering and fine manipulation. The ALJ *did* consider inconsistency, as illustrated above, between the record evidence and David's assertions that he had problems using his left hand. The ALJ did so within the confines of SSR 16-3p where that ruling provides that all evidence should be considered including the claimant's daily activities and other measures used to relieve pain and other symptoms. The record evidence shed light on the intensity, persistence, and limiting effects of David's left hand impairment. David does not point to any evidence the ALJ omitted but instead points to his subjective statements and the ALJ's alleged over-reliance upon his ability to grip. The ALJ cited to more than David's ability to grip in support of her RFC finding. In any event, the Court may not reweigh the evidence in order to, as it appears David suggests, give more weight to his subjective statements. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Where reasonable minds may differ about the results that flow from the evidence, the ALJ's determination will nevertheless be upheld if substantial evidence supporting it exists. *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).

**B**

David contends the ALJ relied upon periods of remission and snapshots of behavior in the confines of doctors' offices to discount longitudinal professional opinions that he has serious mental impairments that impact his ability to perform competitive work. He argues the ALJ erred when she discounted all of his GAF scores and instead drew her own conclusions about his longitudinal condition based upon her own reading of the psychologists' treatment notes. The

Commissioner argues the ALJ's mental RFC finding is supported by the State Agency psychological consultants' opinions and other substantial evidence. She further argues the ALJ's findings were not based on a narrow slice of the record but were instead based upon a comprehensive assessment of all the relevant evidence.

The Commissioner is correct. The ALJ's mental RFC finding is supported by such relevant evidence as a reasonable mind might accept as adequate to support the decision. With regard to David's GAF scores, the ALJ noted that David was assessed with GAF scores ranging from 20-70 and explained limited weight was given those scores because such scores were "of limited use in assessing the severity of a mental impairment for several reasons." AR 39. The ALJ continued:

> GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot. They do not provide a reliable longitudinal picture of the claimant's mental functioning.

AR 39. Interestingly, while David argues the ALJ relied upon snapshots to conclude that he did not have more serious mental impairments, the ALJ articulated in her Decision that she did not give much weight to David's GAF scores as they provided merely "snapshots" of a claimant's mental functioning. The ALJ then discussed, at length, David's treatment records. She discussed his hospitalization for reports of suicidal ideation from June 27 through July 1, 2015, and that he reported improvement following increases to his medication, was observed to interact appropriately with staff and peers, was cooperative and pleasant upon discharge examination, and reported a "better" mood and displayed a euthymic affect at that time.

The ALJ next discussed the records "[s]ince [David's] discharge" which indicated a good response with medication and repeated examination results which revealed euthymic mood and otherwise normal findings. AR 39. The ALJ discussed the fact that David reported situational stressors in December 2014, though he

indicated he dealt with those better "now." AR 40. In December 2016, David was recommended to attend anger management classes based upon his reports of anger problems, but, the ALJ stated, the objective evidence did not document ongoing issues in getting along with others. David also reported that he enjoyed working on cars, spending time with his dog, and spending time with his grandchildren. The ALJ concluded:

> [C]onsidering the period of hospitalization, with the evidence of improvement and increased activity following medication adjustment as reflected in the ongoing clinical evidence, the undersigned finds that he [sic] mental impairments are sufficiently considered in the residual functional capacity limitations to understand, remember, and carry out simple, routine tasks, make simple work-related decisions, and adapt to routine workplace changes. He can persist in such activities in two-hour intervals, before requiring a break, with adequate pace and perseverance.

AR 40. Toward the end of her RFC analysis, the ALJ explained that great weight was due Dr. Hudspeth's opinion as it was grounded in the evidence in the case record and David's allegations about his symptoms and limitations, and the evidence received into the record at the hearing level was generally consistent with Dr. Hudspeth's findings. The ALJ gave Dr. Boyenga's opinion only partial weight because his limitation to settings with reduced interpersonal contact was not supported by the record evidence; the ALJ explained the evidence at the hearing level did not indicate more than mild impairment in that area.

Contrary to David's arguments, the ALJ recited the longitudinal record of David's mental health issues and clearly articulated her conclusion as to the limitations supported by those issues such that the Court can trace her path of reasoning. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ did not overstep in her consideration of the longitudinal

medical record as it is ultimately the Commissioner's responsibility to decide a claimant's RFC. 20 C.F.R. § 416.927(d)(2). The ALJ recited examination results that were plainly set forth in David's medical records and crafted a mental RFC based upon her consideration of those results and other evidence of record. Furthermore, the ALJ's mental RFC finding was compatible with State Agency consultant Dr. Hudspeth's opinion in that the latter similarly opined that David retained the ability to understand, remember, and carry out at least simple one/two step repetitive tasks. AR 91.

David asserts he is incapable of withstanding the stresses of competitive employment, and the ALJ's contrary finding is not supported by substantial evidence. However, he points to only a few discrete circumstances in the record which he says indicate his inability to handle the stresses of the workplace. The ALJ considered those circumstances in addition to the examination results (set forth above), David's attempts at returning to work over the relevant period, and the efficacy of David's medication in treating his mental health issues. Given the ALJ's conclusions and resulting mental RFC finding, it is apparent that the ALJ did *not* decide that half the time David was well enough to work and half the time he was not. *Cf. Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (explaining that a person with a chronic disease under continuous treatment is likely to have better days and worse days and where she was well enough to work half the time and not well enough the other half, she could not hold down a full-time job).

## C

Lastly, David argues the ALJ erred by finding that David's illiteracy is not medically determinable. He asserts that the Commissioner is responsible for providing evidence that demonstrates other work exists in significant numbers in the national economy given David's RFC along with his vocational factors, which include education. He says there is nothing in the record inconsistent with his testimony and statements that he is illiterate rather than of limited education. The Commissioner

15

argues that to the contrary, the ALJ reasonably determined that David had a limited education where he attended school through the ninth grade, the objective evidence did not support his alleged dyslexia or illiteracy, and David's functioning conflicted with his alleged illiteracy.

20 C.F.R. § 416.964(b) provides, in relevant part, that an adjudicator may rely upon a claimant's numerical grade level to determine his educational abilities, unless there is other evidence to contradict it. The "illiteracy" educational level category means:

> [T]he inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 416.964(b)(1). The "limited education" category means:

> [A]bility in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

*Id*. at § 416.964(b)(3). The General Educational Development (GED) levels in the DOT "focus on the worker's educational background, not on on-the-job requirements." *Givens v. Colvin*, 551 F. App'x 855, 863 (7th Cir. 2013). David's argument that he is illiterate rather than of limited education such that the Commissioner did not sustain her burden in this case is unpersuasive.

The ALJ addressed the evidence which cut against David's claimed illiteracy - he held different kinds of drivers licenses which suggested "he has the ability to read road signs at the least," his wife indicated he could follow written instructions "a little," he operated a vehicle which was a very dynamic task, clinical records indicated he had consistently intact attention and concentration, his previous janitor job was classified as semi-skilled, the ability to enter into a loan agreement and contract to

16

perform services reflected greater cognitive abilities than alleged, and he in fact completed ninth grade (albeit in special education). The Commissioner cites to additional evidence in support of the ALJ's finding that David was not illiterate, including that he was able to drive himself to and from appointments. *See* AR 717. Meanwhile, David persists in claiming he should have been deemed illiterate at the hearing level given the evidence he did not complete his own disability application forms, his signature is barely legible, he was in special education as a child, and his counselors stated that he reads between a first and second grade level. In that regard, the Court notes: the ALJ *did* note that David's former wife assisted him in completing a March 2015 Function Report; the ALJ cited to medical evidence which provided, in general terms, David's level of intelligence; and the ALJ need not recite all the evidence of record. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long [she] builds a logical bridge from the evidence to [her] conclusion").

The ALJ's hypothetical question to the VE prompted the VE to identify jobs with DOT level 1 reasoning, a fact that David's attorney elicited at the hearing. Level 1 reasoning in the DOT has a reading grade equivalent of first through third grade. Level 2 reasoning is equivalent to fourth through sixth grade reading level. David makes much of the fact that the VE identified jobs for those with a reading grade equivalent of first through third grade whereas the record indicates David could only read at a first or second grade level. True, a single notation in the record provides (as David points out) that "Client has a reading level of 1st, 2nd grade and he is not interested in changing this." AR 365. That single notation, and even the level 1 requirement of an ability to read at a rate of 95 to 120 words per minute, does not undermine the ALJ's finding that David is capable of doing the work to which the VE testified. *See Givens*, 551 F. App'x at 863 (stating that where workers satisfactorily performing jobs with a level of 3 would be expected to be able to read

17

novels and magazines, nowhere in the job descriptions for the jobs cited by the VE would the person be "*required* to read novels or magazines") (emphasis supplied). David was determined to have a limited education defined as between seventh and eleventh grade formal education, the cited jobs were all at a DOT level 1 reasoning level - notably *below* the grade levels indicated by David's "limited education," and the ALJ sufficiently supported her conclusion that David was not illiterate (as discussed above). Any error the ALJ committed in assigning David a category of "limited education" was ultimately harmless where the identified jobs did not reflect an ability, in fact, to read at the seventh through eleventh grade reading level. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 9) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 13) be granted; 3) judgment be entered in favor of the Defendant, Commissioner of Social Security, and against the Plaintiff, David W.; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on January 2, 2019.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE